AB:JV

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

JIAN TIAN CHEN,
JIAN LIN LIN and
XIAO DI WANG,

          Defendants.

– – – – – – – – – – – – –X

C O M P L A I N T

(T. 21, U.S.C., § 841; T. 18, U.S.C., § 2)

Case No. 20-M-596

EASTERN DISTRICT OF NEW YORK, SS:

        JASON P. PETRI, being duly sworn, deposes and states that he is a Detective with the New York Police Department ("NYPD"), duly appointed to law and acting as such.

        On or about July 29, 2020, within the Eastern District of New York, the defendants JIAN TIAN CHEN, JIAN LIN LIN and XIAO DI WANG, together and with others, did knowingly and intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, to wit, marijuana, in violation of 21 U.S.C. § 841(a)(1).

        (Title 21, United States Code, Section 841; Title 18, United States Code, Section 2).

        The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and

1.      I have worked for the NYPD for 14 years.  For the past five years, I have worked in the Border Enforcement Security Task Force ("BEST") Seaport Team.  As part of that assignment, I am deputized as a federal task force officer with the Department of Homeland Security.  The BEST Seaport Team conducts a mix of long- and short-term investigations at the federal and state level.  The investigations involve smuggling, trademark counterfeiting, money laundering, and firearms and narcotics distribution.  I previously worked in the burglary squad, the narcotics division, and the organized investigations divisions.  I have participated in investigations of narcotics and money laundering activities, including surveillance and the execution of search warrants.  I am familiar with the methods used to package and process controlled substances, including marijuana.  I am familiar with the facts and circumstances of this investigation from my personal participation in this investigation, and from information obtained from other law enforcement agents and others.  I have been involved in numerous investigations involving marijuana distribution, packaging, sales, and other criminal activities associated with marijuana.

2.      On or about July 29, 2020, members of law enforcement, including myself, were in plainclothes and in unmarked vehicles outside of a warehouse located at 701 East Linden Avenue, Linden, New Jersey (the "Warehouse").

3.      While I was at the Warehouse, I observed multiple individuals exit the Warehouse carrying approximately 10 large black bags and loading the bags into the back of a waiting car ("CAR 1-A").  One of the individuals, now known to be defendant JIAN LIN LIN, appeared to be in charge and giving directions to the other individuals.  He repeatedly scanned

---

circumstances of which I am aware.

the area visually while speaking on a cellular phone. Based on my training and experience, I thought that JIAN LIN LIN was looking out for law enforcement. After loading the black bags into CAR 1-A, one individual entered CAR 1-A and drove off, followed by another vehicle ("CAR 1-B"). Based on my training and experience, I thought that the black bags loaded into CAR 1-A might contain narcotics or other illegal products and decided to follow CAR 1-A.

4. As I followed CAR 1-A, I observed CAR 1-A and CAR 1-B drive unusually. Specifically, CAR 1-A and CAR 1-B sped up, slowed down, stopped and turned in a manner not in conformity with normal driving patterns. In my training and experience, CAR 1-A and CAR 1-B were engaging in counter-surveillance measures designed to identify whether they were being followed. In order to avoid detection, I turned and lost direct sight of CAR 1-A and CAR 1-B. When I returned to the location, the two cars were gone.

5. While I was following CAR 1-A and CAR 1-B, other members of law enforcement observed another car ("CAR 2-A") being loaded with approximately 10 to 12 large black duffel bags from the Warehouse. After the black bags were loaded into CAR 2-A, one individual entered CAR 2-A and drove off, followed by another vehicle ("CAR 2-B"). Members of law enforcement attempted to follow CAR 2-A and CAR 2-B. CAR 2-A and CAR 2-B also engaged in unusual driving patterns that, based on my training and experience, I believe were intended as counter-surveillance measures. Members of law enforcement were unable to remain undetected and loss sight of CAR 2-A.

6. When I returned to the Warehouse, I observed a third car ("CAR 3-A") being loaded with four large black duffel bags. After the black bags were loaded into CAR 3-A, one individual entered CAR 3-A and drove off, unaccompanied. I followed CAR 3-A.

4

CAR 3-A engaged in similar unusual driving patterns that, based on my training and experience, I believe were intended as counter-surveillance measures.

7. I followed CAR 3-A to Avery Avenue in Flushing, Queens, New York. CAR 3-A double-parked next to a Toyota Siena that was parked on Avery Avenue ("CAR 3-B"). At no point from the Warehouse to Avery Avenue did I lose sight of CAR 3-A.

8. While parked side-by-side, CAR 3-A and CAR 3-B both opened their rear lift gates or trunks. The drivers of both cars exited the vehicles and moved four black large duffel bags from the trunk of CAR 3-A and placed the four bags into the trunk of CAR 3-B. The drivers of the two vehicles then re-entered their respective vehicles, and drove in different directions. At this point, I followed CAR 3-B.

9. When Car 3-B left his parking spot, the vehicle did not signal when it pulled out into traffic, and entered traffic at an unsafe high speed. Approximately one block later, on Fowler Avenue, I turned on my vehicle's police lights, and CAR 3-B pulled to the side of the road. I approached the driver of CAR 3-B, later identified as defendant XIAO DI WANG, and identified myself as a member of NYPD.

10. When I asked WANG where he was coming from, he pointed back in the direction he had driven from. When I asked WANG where he was going, he said "No." When I asked WANG whether he had anything in the vehicle, he said "no" multiple times. When I asked what was in the black bags in the rear of CAR 3-B, he said "No." When I asked if there were drugs in the black bags, he said "Yes." After he said "Yes," I asked if he could show me. In response, he stepped out of CAR 3-B, went to back and opened the rear lift gate or trunk. Upon opening, I could detect a faint smell of marijuana and saw the four large black bags.

11. At this point, in response to questions, WANG said that he did not speak English. When I asked if he spoke Mandarin, he told me "No." When I asked, in a series of questions, whether he spoke Cantonese, Fukinese, Korean, Japanese and multiple other Asian languages, he answered each time "No." When I asked WANG what language he did speak, he answered "I don't know." Throughout this series of questions made in an attempt to identify what language I could communicate in with the defendant, he was not detained or restrained.

12. Based on my training, experience and initial interactions with WANG, I believed that he could speak English, but was attempting to avoid questioning. At this point in my interaction, I requested the presence of an NYPD officer who spoke Mandarin and Cantonese. When an NYPD officer who spoke Mandarin and Cantonese arrived, he established that WANG was from Beijing, China, and spoke Mandarin.

13. WANG told me, through the translator, that he lived in Florida and had stayed overnight in a hotel, before checking out that day. He claimed that he had met with a friend that day, who had asked him to transport the packages, but that he did not know the friend's name or telephone number. He claimed that he did not know the contents of the black bags. He claimed that transports items once a month, but had only met that individual for the first time that day.

14. After he told law enforcement – through the translator – that the bags belonged to his friend and that he was transporting the bags for his friend, I asked if he would open the bags. WANG consented and he opened each of the bags in turn. WANG reached into the rear of CAR 3-B and opened each of the four black bags himself. Each of the four

6

black bags in the trunk of CAR 3-B contained large, heat-plastic wrapped bags of marijuana. Law enforcement then arrested WANG.

15. The total amount of marijuana within the four black bags in the trunk of CAR 3-B is approximately 150 pounds.

16. Other members of law enforcement continued to surveil the Warehouse while I followed CAR 3-A and, in turn, CAR 3-B, and interacted with WANG. During this time, members of law enforcement observed CAR 1-A and CAR 1-B return to Warehouse. Members of law enforcement then observed approximately 9 additional large black duffel bags being loaded into the trunk of CAR 1-A at the Warehouse. After the black bags were loaded into CAR 1-A, one the individuals entered CAR 1-A and drove off, again followed by CAR 1-B. Members of law enforcement did not attempt to follow CAR 1-A, and instead continued surveillance of the Warehouse.

17. After CAR 1-A departed for the second time, members of law enforcement approached the Warehouse, announced their presence to a worker and asked, in sum and substance, to speak with a manager or owner. Members of law enforcement were introduced to an individual, initials GZ ("GZ"), who identified himself as leasing the entire Warehouse from the Warehouse owner. That individual consented to a search of the Warehouse and personally led members of law enforcement on a visual search of the Warehouse. At this time, members of law enforcement were accompanied by a United States Customs and Border Protection ("CBP") canine unit trained to detect narcotics. The canine handler has 28 years' experience as a canine handler with CBP. The canine team has been in the field since September 2017. The canine has been trained to detect marijuana and has

proven reliable in the field. The canine team completed their yearly re-certification on June 18, 2020.

18.  During the tour of the Warehouse, GZ directed members of law enforcement to a set of closed, locked double-doors, and told law enforcement that the individuals who had been seen with the black bags had used that space. GZ consented to law enforcement searching the area behind the doors, but could not find the keys to the locks. GZ consented to law enforcement searching the area behind the door and provided members of law enforcement with two knives to use to unlock the doors, which they did by manipulating the lock mechanism. GZ consented to law enforcement opening the doors in this manner. Behind the previously closed, locked doors, members of law enforcement found defendants LIN and CHEN in opposite corners of the room with their backs to the door, and, among other things, six additional large black bags. The six large black bags smelled strongly of marijuana. The canine unit triggered in the presence of the six large black bags.

19.  Upon questioning, LIN and CHEN both said that they wanted attorneys and law enforcements stopped questioning. Law enforcement placed LIN and CHEN under arrest.

20.  Each of the six black bags found in the locked office with LIN and CHEN contained marijuana. The total amount of marijuana within the six black bags in the locked office with LIN and CHEN is approximately 200 pounds.

21.  In total, approximately 350 pounds of marijuana was seized from the three defendants.

8

WHEREFORE, your deponent respectfully requests that the defendants JIAN TIAN CHEN, JIAN LIN LIN and XIAO DI WANG be dealt with according to law.

/s/ Jason Petri
JASON P. PETRI
Detective
New York City Police Department

Transmitted to me by reliable electronic means
and sworn to by telephone this
30th day of July, 2020

THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK